Case number 233682, Sierra Club, et al. v. TN Department of Environment and Conservation, et al. Oral argument not to exceed 15 minutes per side, with 15 minutes to be shared by respondents and the intervener. Mr. Tini, you may proceed for the petitioners. Good morning, Judge Moore, and may it please the Court. My name is Derek Tini, and I, along with my colleague, Jamie Whitlock, represent the petitioners on this petition for review. And I'd like to reserve five minutes for rebuttal. Thank you. This petition for review is of a Federal Clean Water Act permit issued by the State of Tennessee for the Cumberland Pipeline. At bottom, and as in the companion case we'll be discussing in a little while, this case presents an administrative agency that cut corners in its review process. At each step, the Tennessee Department of Environment and Conservation, or TDEC as I might occasionally say, relied on unsupported generalizations rather than on the legally and scientifically required site-specific review. It did not examine the appropriate crossing method or rock removal on a crossing-by-crossing basis. It refused to gather relevant baseline information or evaluate cumulative effects. It also failed to grapple with scientific record evidence of long-term significant water quality impacts from open-cut crossings, and it didn't look at the potential for downstream sediment transport by wet weather conveyances. All of these failures have consequences for Tennessee streams. Open-cut crossings, like those proposed by TGP, should be avoided if practicable. And that's because blasting or trenching through a stream bed, even if done in the dry, as they say, it leads to long-term downstream sedimentation. And that sedimentation demonstrably affects aquatic life health. To avoid those impacts, yes, Your Honor. So as I understand it, one of your claims is that TDEC needed to do this stream-by-stream. How do you know that they didn't evaluate 100-plus streams stream-by-stream? Because the record is devoid of the evidence that would be needed to do that on a case-by-case basis. So there is this chart somewhere in the materials that has each stream listed, and it says that they're going to use the dry-cut method. Why is that not a showing that they looked at each stream and decided to use the dry-cut method? As the petitioners pointed out in their comments, and I believe as TGP also highlighted in some of its submissions, to understand conventional boring, what's really necessary to understand is the topography of the stream banks. And the reason for that is that determines the depth of the bore pits. So bore pit depth is a determination that needs to be made to understand the practicability of that method. There is no information on a site-specific basis about what the slopes are like or what the depth of the bore pit would be. Also absent from the record is any estimate of cost whatsoever for any crossing or in the aggregate. And that's also necessary to understand the practicability if you're going to rely on cost, as both TGP and TDEX seem to do. So it's all been done at this high level of generalization. Oh, it's more expensive. But the standard, of course, is not is it more expensive. The standard is whether it is practicable. Well, what is the basis for the conclusion that they had to look at every single stream? If they had an appropriate, and I don't know if they looked at every single stream or not, but if they had an appropriate methodology, why did they have to look at every single stream? I mean, you're putting that forward as an irrefutable conclusion, and I'd like to know the basis for that. Sure. Your Honor, that's required both by the law and by the science. By the law, it's required by Section 401 of the Clean Water Act, which requires the state to certify any discharge. And the discharge is to a specific stream. Any means each and every. So they've got to certify every discharge. Well, the Section 401, the section doesn't say they have to look at every single stream. Well, it doesn't speak in terms of streams. It speaks in terms of discharge. It says that the certification under 401 is for any discharge. And the discharge is on a stream-by-stream basis, right? Each of these activities has to be permitted. The discharge is going to change from day to day and from time to time. So you have to reasonably look at discharges, perhaps. But if that's going to be the stumbling block, you can never do anything because these streams and environmental factors involve movement of elements. It's not a static environmental situation. But, I mean, you're stating it as an irrefutable truth that there's something identifiable that can be quantifiable, that can be measured. But that's not really true, is it? Well, streams are dynamic, but that's not the question of discharges. But I think you can still take a snapshot of the conditions at a stream. And let me back up and look at what the definition of discharge is. The discharge is the redeposit, the burying of the pipe, right? There are a number of discharges. So it's the fill material that's going into the stream at a specific location. It's not necessarily the stream flow, though that is one of the conditions that should be considered. So you could look at the conditions. For example, they maintain they looked at some of the physical conditions. But what they haven't looked at is what are the slopes on either side of the stream. And in this record, in fact, there's something to undermine the conclusion that all these streams are the same in topography. If you look at JA 1427, that looks at eight large water bodies. And it says that three of them have gentle slopes, three out of eight, almost 40 percent, rather than steep sloping. The argument was, oh, my goodness, this pipeline is going to be constructed in the steep hills of Tennessee. It's not feasible to use conventional boring. But here we have at least three streams, two of which are going to be open cut, Yellow Creek and Furnace Creek, that even TGP admits have gently sloping banks. And that's, again, at JA 1427. So your argument, just to get it, is that for each stream, and there are 100 plus, including the WWCs, which are wet weather conveyances, you need to have a particularized statement as to why open cut is the preferable method or why boring couldn't be used. And there apparently are five different kinds of borings that you could use. You need to have that precision for each stream. And so this Table 10.5-1, which says pipe install method, dry open cut, doesn't explain why that choice was made for each of these streams. That's correct. That is a conclusion not supported by any reasoning or any facts in the record that are necessary to understand the feasibility. What is your authority telling us that that's what we have to do here? Is it interpreting just the 401 of the Clean Water Act? Or is it a case from another circuit, like the Fourth Circuit case? Or what is it that tells us that you are right or wrong, as your case may be? I understand the question. The Fourth Circuit case shows a pipeline that did that kind of stream-by-stream generalization. We have the language of Section 401. And then we also have the language of TDEC's own program, which says that no permit should discharge unless it's the least environmentally practicable alternative, and that it must be for each activity. And activity is defined as any or all work. And so it does have to look at each stream. If activity is any or all, why doesn't it involve all, meaning these whole 100-plus streams, and open-cut is generally the best method, they're saying, but we're going to use the HDD method for four of these because they're bigger waterways? Well, there are additional big waterways. And some of these that I held up on that JA page are among them, Barton's Creek and Furnace Creek. But the any or all, well, let me take a step back. Imagine that someone applied for a single discharge, and they tried this high level of review. Well, generally in Tennessee, the open-cut process is the most practicable. If they spoke in that sort of generalization and they only had one stream, well, that would be arbitrary and capricious, right? Because there's no question that they could go out and look at that single stream. But here we would reward an applicant for proposing more than one, two, three, nearly 100. And this permit, if they're allowed to look at it at such a high level, would encourage a rule that would result in less scrutiny given to the largest, most destructive projects than to, say, a single crossing. So it can't be dealt with at that level of generality. It has to be done on a stream-by-stream basis. Because the conditions will be different at every stream. And I think that's really well established by the fact that even TDEC and TGP acknowledge that there are site-specific considerations, specifically with regard to the rock removal method, right? They say we can't determine in advance what rock removal method we're going to use until we get out there and see the individual stream conditions. Well, if the conditions are so variable that you need to understand each stream to do rock removal, the very same thing is true about that trenchless versus trenching method. So could TDEC have said we'll leave it to TGP when they look at a particular waterway to decide whether to use open, cut, or trenchless? I see that I've run out of time. May I answer your question? Sure. Yes, thank you. No, they could not. That would have been that kind of impermissible assignment of the regulator's job to the regulated entity. And, in fact, in some ways the permit does that because what TGP says is if we get out to one of these streams and the flow is too high, we reserve the right to go under it, which suggests that it was practicable from the drop, right? It's just that they didn't want to do it. And is there a case that you would point us to that would take your position in terms of each and every stream? In terms of each and every stream? If you look at the Esty Warren case by the United States Supreme Court, that case stands for the proposition that it's any discharge. Again, it's the language of Section 401. If you look at the CORE Alaska case, this is looking at 404, but it talks about the CORE have to evaluate the environmental effects of every discharge. The same is true of TDEC. They can't speak at this high level of generalization, especially on an individual permit. There is a general permit for projects that have less impact that wouldn't receive this individual scrutiny on a crossing-by-crossing basis. This pipeline isn't eligible for that. What they've tried to do is give them general permit treatment under the auspices of an individual permit, and that is impermissible. Thank you. Thank you, Your Honor.  Good morning, Your Honors. May it please the Court, my name is Wilson Buntin. I'm with the Tennessee Attorney General's Office, and I represent the respondent, the Tennessee Department of Environment and Conservation, which I will refer to as TDEC in this oral argument. I'm going to spend the bulk of my time this morning covering the issues that have been briefed, but upon consideration of Judge LaPard's dissent in the order-granting motion for stay, the State has reconsidered its position and now does not think that this Court has subject-matter jurisdiction. The State requests the opportunity to provide supplemental letter briefing on the question of subject-matter jurisdiction. The Tennessee Department of Environment and Conservation did not act arbitrarily and capriciously in granting this 401 certification. Arbitrary and capricious review is a narrow and deferential standard. TDEC should be given deference as to its factual determinations, which involve matters of technical and scientific expertise. To get to the heart of what your opponent was arguing, did TDEC perform a stream-by-stream evaluation of the different methods that could be used and what was the most practicable alternative? Your Honor, TDEC reviewed the materials that were submitted by TGP in its application. Those materials included information data on a stream-by-stream basis. It's the Table 10.51 that you had mentioned, Your Honor. But looking at that, which I found and have, it just concludes dry-open-cut is going to be used for all of these various streams, and it doesn't say why. And the interesting contrast is with the document in this Mountain Valley Pipeline Project, which has an explanation on the side explaining why they are picking whatever method they're picking. So where is that explanation in your case? Your Honor, there is no Table 15 in our case. I point out that Table 15 was brought up in the petitioner's reply brief. It was never submitted as a win petition. But you can find it. It is publicly available, yes, Your Honor, but it was not submitted as part of the comment process on TDEC 401. As an example, petitioners could have done that. They did not do that. But you're saying, A, that you didn't do that, you, TDEC, didn't do that. Not a Table 15. And you're relying on TGP, who I guess is going to be talking to us shortly. Yes, Your Honor. But so far as we know, looking at the record material here in your case, how could we say as a matter of clarity that there was a stream-by-stream analysis of the pros and cons when it's not in this particular table, which is the only table that we're pointed to? Yes, Your Honor. I understand your question. There is, as you had mentioned at the beginning of the certification, there's a listing of all the streams that will be impacted that have received a 401 certification. TDEC is not limited to considering only stream-by-stream information. It may, under the rules, consider broader, more project-wide information, and it did in this case. So you're saying then that the law allows somebody like TGP to just say, hey, we prefer open-cut, dry open-cut. We think that's a great method. There are two different ways to do it. We're going to pick one or the other for each of these streams, even though they clearly differ a lot. And they're doing that particular method for all 100-plus, and only four of them are getting special treatment. No, Your Honor, that would not be sufficient, and that is not what TGP has done here. They have submitted a written alternatives analysis comparing open-cut versus dry-cut. But is that comparing it in general as opposed to stream-by-stream? Yes. Yes, they have submitted stream-by-stream information as well as more general information. They've submitted both, and TDEC relied on both types of information. I'm sorry, I may be not understanding. Did TGP submit stream-by-stream analysis of the least environmentally invasive, whatever the magic words are, or not? By stream-by-stream. They submitted their, well, I will let TGP speak to that. They did submit information on a stream-by-stream basis, table 10.51. They did indicate to TDEC, here are the factors that we look at in determining open-cut versus. That seems to me not to be answering my question. Maybe I'm being dense, and you can tell me that in a nice way. But it looks to me, looking at any one of these pages of 10.5-1, that it's lots of little details, like something's a perennial slash spring, and something's an ephemeral slash WWC, and what the substrate is, and the karst potential. They have all these little factoids there. But as to why they're picking dry, open-cut is not clear to me, looking at it. Table 10.5 does not include that, Your Honor. Your Honor, with my remaining time, I will. Can I ask one follow-up on that? It's my understanding, and TGP can correct this, but that they submitted the least environmentally harmful that was the most practicable. Did you have an obligation to look behind that, or what exactly happened? What was TDEC doing? Were they rubber stamping it, or did they look behind it? No, Your Honor, they did not rubber stamp it. TGP submitted information on the practicability, and practicability must consider costs, technical feasibility, logistics. They did submit information just so that the HDD crossing method is significantly more expensive, takes more time, has other environmental considerations. They did submit a summary of information showing HDD, horizontal directional drilling, is much more expensive, takes more time. TDEC did not just accept what TGP gave it. And then the Special Condition G permit? Yes. Does that require just what, how does that work? Do they check with you as they go once they discover bedrock, or how does it work in practicality? Yes, Your Honor. Special Condition G requires consideration of five different methods if they encounter bedrock for trenching. TDEC set the five methods, identified criteria that must be considered. It's site-specific criteria that must be considered. And for the most impactful method, blasting written permission from TDEC is required before that is allowed. Go ahead. So just understanding the facts, the five different methods are for open trench, is that correct? Yes, Your Honor. For this dry cut method that was selected for everything except for the HDD method? Yes, Your Honor. It is a tightly controlled process, Your Honor. Special Condition G and H ensure that it is a tightly controlled process. So do they check with TDEC once they pick one of the other four, or can they just, as long as they don't pick blasting, they can do it? They do not have to check with TDEC for the other four, but there are requirements built in to make sure they choose the least impactful practical alternative. What happens if they don't? What happens if TDEC discovers they didn't? They would be subject to enforcement by TDEC, civil penalties in order of correction. There are a litany of matters that they may be subject to, but TDEC could take enforcement action if they do not select the least impactful practical alternative. Your Honor, with my remaining time, I will speak to the 401 certification mostly authorizes impacts that are temporary in nature, not permanent. The conditions ensure that. It authorizes only .03 acres of wetlands, permanent impacts, and that is really a conversion from a forested wetland to a herbaceous wetland. It only authorizes 490 linear feet of stream for permanent impacts, and that's to make, Your Honor, see that my time has expired. Thank you. Thank you. Thank you. Good morning. May it please the Court, David Super on behalf of Tennessee Gas Pipeline. Your Honors, Tennessee Gas Pipeline did provide and TDEC did consider crossing-by-crossing information on the least practical alternatives for crossing water bodies. TGP provided- Where is that? Well, Your Honor, you already pointed to Table 10.5-1 that provided critical information on each of the water bodies, including the flow type, the substrate, the material beneath the water body, the geologic formation, the karst potential, the watershed position, drainage area, summer mean flow, and hydrologic loss potential. In addition, though, TGP provided 250 more pages of crossing-by-crossing information, including descriptions of stream channels and surrounding uplands, stream flow regime, and aerial images and field surveys. And I can provide you the docket sites for all that information is, but if you look at JA0269-284, JA0351-367, JA0054-223, JA0225-268. And based on that information and analysis, TGP did propose predominantly dry, open-cut trenching with forest streams to be crossed by HTD. And TDEC studied that information and determined that TGP's proposed crossing methods were the least impactful, practicable alternatives, considering technology, logistics, time, cost, and the avoidance of unnecessary disturbances. So to compare what you're saying is in these pages, which obviously we'll look at, was the same kind of information provided in those pages as in this Table 15 in the Mountain Valley Pipeline Project, where there was an evaluation saying crossing method decision rationale, which explained the rationale for each of those? That's a good question, Your Honor, and the answer is no, that Table 15 was not provided in this case, but I think it's really important to point out that the Sierra Club, in the Mountain Valley Pipeline case, criticized Table 15. They criticized that crossing by crossing information. They said it was not sufficient. It's like they've come up with their platonic idea of what the sufficient information is, but then in the real world they complain if the agency decides that some other body of information is what is necessary to compare the conditions of a stream with the method of crossing that stream. And what we have here is a situation where TGP provided well over 250 pages about crossing by crossing information, but also provided information about the difficulties of the different methods, and is within the agency's discretion and expertise and experience to combine those two sets of information and confirm that a dry crossing is the best way to... the most practicable way to cross these streams. On the conventional bore in particular, TDEC reasonably considered the information and determined that conventional boring is not a practicable alternative. It relied upon six factors that TGP provided information on, including the length of the crossing. You can't do a boring on a very short stream. You've got to dig two giant pits on either side, and if you're crossing a two-foot stream, there's no practicability in that. Are there other kinds of boring other than what you just called conventional boring? Like, for some reason, and I apologize for my lack of scientific knowledge here at the moment, but I thought there were five different kinds of trenches, you know, underground trenches that could be done. HDD was one, conventional boring. There's another one called direct pipe, and then there's a couple of more microtunneling. Those methods are essentially more sophisticated methods of the HDD. In direct pipe, for example, I think the pipe goes in along with the boring mechanism. But they involve the same practicable limitations as any kind of boring, which is, it's really hard to do when the substrate is made of rock. It's very hard to bore through that. When you've got slopes coming down to the stream, it's very hard to dig the giant trenches you need to dig to get through the stream. There's also trees in the way. There's all sorts of practical limitations. But if it's rock, don't you have to dig into it if you're doing the open-cut method, too? That is correct, Your Honor. But what I'm saying is, the boring doesn't work when you've got rock. If you do the dry open-cut crossing, there are methodologies to remove the rock when you get to it. And under Special Condition G, TGP is legally required to use the least impactful method. There's an assumption, I think, by Sierra Club, that Tennessee Gas Pipeline is going to violate the law. It's required to use the least impactful method. It's got to go to the field, look at the conditions. And by the way, there are also environmental inspectors on site. That's a requirement of the FERC, Certificate of Public Convenience and Necessity, that will be monitoring all of this. So they can't just go and use the wrong method because they could have their certification revoked by TDAC. And I see my time is out. Thank you. Thank you. What about these 250 pages? Certainly. Thanks for asking about those, because I was going to leave with those. Yes, there are pages of pictures of these streams and some basic information that largely provide the information that turned up in Table 10.5.1. Why was this information gathered? It was not gathered for the purposes of determining what the least impactful practical alternative is. It was to determine whether or not they needed a permit for it at all. All of this information was part of what they call the jurisdictional determination, to determine if there are streams or wetlands that are regulated by the Clean Water Act, which, as you may know, is a controversial question, in the path of this pipeline. And that's what those data were to establish. They were not to analyze the factors that turn up in Table 15, which, yes, was not in the record, but is described in detail at JA2486. There's a narrative description of what ended up in Table 15, where you look at the bore pit depth, the steepness of the slope. Is there an area to store the spoiled dirt that will come out of the bore pits? And to the question of, you need to cut down trees, they're on a right-of-way where they've already cut down all the trees. So they have the area to do these crossings. What they really want to do is avoid the cost. And the case law is clear that just because something is more expensive doesn't mean it's impracticable. And that's the Delaware River caper case that we cite. It's the Utahans for Better Transportation case that we cite. And even the Corps itself in the Federal Register Notice for the 404B1 Guidelines says that more expensive does not mean impracticable. That's what they are trying to avoid. But back to your question. The data that they provided, it was to go to the jurisdictional question, not to the practicability question. But to the extent that it's in there, you can look at these pictures. For example, the pictures of Barton's Creek, the pictures of Furnace Creek will show that, hey, those steep slopes, that steep topography that is said to exist throughout the pipeline isn't at these crossings. And these crossings, Barton's Creek, for example, is 62 1⁄2 feet wide. That's wide enough to do a conventional bore. The slopes appear to be flat. That's just one example of what's missing from this general analysis that they did. If they missed Barton's Creek, there are others as well that they should have picked up. Have you given estimates of the cost of the method of cutting that you're proposing for all these streams? Have you provided that information? We have not provided specific cost estimates on these streams. The burden is on the applicant to establish that something is impracticable. And it's up to the agency to independently verify it. What we submitted was evidence that a pipeline in the same type of topography, the Mountain Valley Pipeline in central Appalachia, is going to use conventional boring, did use conventional boring, at more than 100 sites, showing that it is practicable and affordable for a pipeline. EPA has said that when you're considering these cost practicabilities, it's whether it's practicable in the sense of, do people spend this kind of money on this type of project? The topography here would be different from the other instance that you mentioned. It's like you don't have any idea what this is going to cost. Even if you say the burden is on them, you've not provided any estimate of the cost factor yourself. You're just making generalized statements about cost, which is not very helpful. Again, we are making statements that pipelines in similar terrain, and I would suggest, and maybe this is my West Virginian coming out in me, that the hills of West Virginia are pretty steep. And I know Tennessee has got some steep hills, but some of it is a little flatter too. We don't know if the terrain is terribly similar or not. Because we don't know the specifics of the terrain. We don't know that. And that's exactly the problem. There are a lot of conclusory arguments you're making without the data. And that's because the data wasn't provided by the applicant. We don't know what the grade of the slopes were at any particular stream because the applicant didn't provide it. And all of that information is at their disposal. They have engineers who are doing cost estimates. They apparently think that it's five times as much. They didn't provide that information. What we showed is, here's a pipeline that has used it. It's feasible in the context of a project like this, and that's the standard that EPA has prescribed to be used in such standards. Is it practicable for pipelines of the same, or projects of the same nature? Can I ask you just a couple questions that are a little off topic, which won't surprise you? But first, just under, do we review this consistent with Tennessee arbitrary and capricious law or federal arbitrary and capricious law? I'd be happy to answer. I see that I've run out of time. I'd be happy to engage on your questions. In this case, it does not matter because there is no difference. Most of the courts of appeals that have addressed this have applied the APA standard. But that's because when they've compared the APA— I'm sorry to interrupt you, but doesn't 701 of the APA say we don't do that with state agencies? Well, it says that it applies to federal agencies. Correct. But when you look at the language of 706 and you compare that to the language of the Tennessee APA, which I think is the Tennessee Code Annotated 4-5-322H— You're just saying it doesn't matter. It doesn't matter. Okay, they're all there. The second question is, what if the challenge was that under Tennessee state law, the TDEC administrator was unlawfully appointed? Would we have the exclusive jurisdiction to review that? I think that you would, and here's why. Because Congress said that it's all—any civil action, original and exclusive jurisdiction. Wait, just so I understand it, we would review whether he was unlawfully appointed under the Tennessee Constitution or Tennessee state law under that scenario? Yes, because there's still a federal ingredient to this case. And as the Supreme Court held in 1824— You're saying that's enough under Osborne? Yes. Well, let me tell you what the ingredient is. Because this usurper, under your hypothetical, is exercising authority under federal law that we argue he's not entitled to. And to work backwards, you have to start from, okay, well, who does federal law authorize to do this? So there is a federal ingredient there. If this usurper were acting— This usurper couldn't act in this circumstance without federal law being present because the Natural Gas Act preempts every other state law. So the only avenue into this action is through federal law. If there are no other questions, we respectfully request that the Court vacate the 401 certification. Thank you, Your Honors. Thank you. Thank you all for your argument, and the case will be submitted.